*Formatted for Electronic Distribution* *Not for Publication*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

Filed & Entered
On Docket
June 1, 2020

_____

**In re:**
    **Robert and Tay Simpson,**
        **Debtors.**

_____

Chapter 12
Case # 17-10442

*Appearances:*  Jan M. Sensenich, Esq.
                Norwich, Vermont
                *Chapter 13 Trustee*

                Rebecca A. Rice, Esq.
                Rutland, Vermont
                *For the Debtors*

                Bernard D. Lambek, Esq.
                Montpelier, Vermont
                *For VACC*

Gary L. Franklin, Esq.
Primmer Piper Eggleston & Cramer P.C.
Burlington, Vermont
*For Wells Fargo*

**MEMORANDUM OF DECISION**
**GRANTING THE TRUSTEE'S MOTION TO AMEND CONDITIONAL DISMISSAL ORDER,**
**GRANTING THE DEBTORS' MOTION TO MODIFY THEIR CONFIRMED PLAN,**
**AND DENYING WELLS FARGO'S NOTICE OF SUBSTANTIAL DEFAULT WITH REQUEST FOR DISMISSAL**

       The fundamental question presented by the constellation of matters before the Court is whether the Debtors have demonstrated they are entitled to attempt reorganization without the stringent conditions placed on their performance earlier in the case. For the reasons set forth below, the Court answers that question in the affirmative.

**JURISDICTION**

       This Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. The issues before are the Court are core proceedings arising under Title 11 of the United States Code as described in 28 U.S.C. § 157(b)(2)(A), (L), and (O). Therefore, this Court has constitutional authority to enter a final order deciding these three contested matters.

1

**PROCEDURAL HISTORY**

When the Debtors filed this case, the relationship between the Debtors and their primary creditor, Wells Fargo, was extremely tense, based on many years of engagement in a cycle of payment defaults, litigation, workout agreements, financial struggles, failed renegotiations, and renewed litigation. This cycle began prior to the Debtors' first bankruptcy case in 2012 (Ch 12 # 12-10564), continued between dismissal of that case and the filing of this case, and during this (their second) bankruptcy case, which has been pending since 2017. Most recently, before the petition date, the Debtors and Wells Fargo had entered into an agreement in which Wells Fargo offered a significant reduction in the amount due if the Debtors paid the debt quickly, and in return the Debtors promised they would surrender the collateral securing Wells Fargo's debt (essentially their entire farm), and not file bankruptcy, if they were unable to meet those payment terms. As it turned out, however, the Debtors were not able to fulfill their payment obligations under that agreement and did file for bankruptcy relief. That series of events set the adversarial tone that has permeated each stage of this case, including a vigorously litigated confirmation hearing and a court-initiated conditional dismissal order, both of which are in contention at this time.

The confirmation process herein culminated on July 13, 2018, approximately nine months after the Debtors commenced this case, when the Court issued its findings and order confirming the Debtors' chapter 12 plan (doc. # 145), an order denying Wells Fargo's motion to dismiss the case (doc. # 146), and a <u>sua sponte</u> conditional order of dismissal (doc. # 147, the "Conditional Dismissal Order").[1] Wells Fargo alleged a substantial default on January 2, 2019, which was resolved without dismissal in early February 2019, as the Court determined the Debtors were not in substantial default (<u>see</u> doc. ## 194–209).[2]

After an apparent one-year lull in the battles that characterize this case, on February 26, 2020, the Trustee filed his motion to amend or vacate the Conditional Dismissal Order (doc. # 233, the "Trustee Motion"). The next day, Wells Fargo filed a notice of default under the Conditional Dismissal Order (doc. # 234), and then filed a notice of substantial default with a request for dismissal of the case on March 3, 2020 (doc. # 236, the "WF Motion"). Two days later, the Debtors filed both an objection to the WF Motion and a motion to modify their chapter 12 plan (doc. # 237, the "Debtors Motion"). Wells Fargo filed objections to both the Debtors Motion (doc. # 243) and the Trustee Motion (doc. # 241), and the Trustee filed a reply (doc. # 244).

After entry of this Court's scheduling order on March 27, 2020 (doc. # 245), the Vermont

---

[1] As VACC observes in its memorandum in support of both the Trustee Motion and the Debtors Motion (doc. # 247), the Court clarified the Conditional Dismissal Order in its restatement of the Court's June 22, 2018 bench ruling on Wells Fargo's motion to dismiss the case and on confirmation of the Debtors' plan (doc. # 224). In that restatement, the Court stated "[t]he only substantive changes the Court has made in issuing this written version of the ruling are (a) to insert full citations to all cases included in the ruling and (b) to clarify the terms of the conditional dismissal relief granted to Wells Fargo (based on the confusion that provision subsequently generated[).]" (doc. # 224, p. 11, n. i (docket citations omitted)).

[2] Wells Fargo also filed a notice of substantial default on April 1, 2019 but withdrew it on April 11, 2019 (doc. ## 216, 226).

2

Agricultural Credit Corporation ("VACC"), another large creditor in this case, filed a memorandum of law in support of both the Trustee Motion and the Debtors Motion (doc. # 247), and the Debtors filed support for the Trustee's Motion (doc. # 249). The Trustee filed a memorandum of law in support of the Debtors Motion (doc. # 248), and Wells Fargo filed a supplement in opposition to both the Trustee Motion and the Debtors Motion (doc. # 250). The three contested motions were fully submitted as of April 15, 2020, and the Court took them under advisement at that time.

## ISSUES PRESENTED

These contested matters raise three interrelated issues: first, whether there is cause to amend or vacate the Conditional Dismissal Order as the Trustee requests, pursuant to this Court's equitable authority and § 105[3]; second, whether the Debtors have established the criteria of § 1229 for leave to modify their confirmed plan; and, third, whether Wells Fargo has demonstrated cause to dismiss this bankruptcy case, under § 1208.

## DISCUSSION

When confirming a chapter 12 plan, the Court must determine if the debtor has complied with the requirements set out in § 1225. Some of those requirements are objectively clear and well-defined, e.g., whether the debtor has paid all fees and domestic support obligations and complied with all requirements of Title 11. See 11 U.S.C. § 1225(a)(1), (7). Others, however, require a more subjective and probing analysis, e.g., whether the debtor proposed the plan in good faith, or a discernment and projection dependent on factors that are beyond the parties' control and/or not susceptible to prediction with certainty, such as whether the debtor will be able to make all payments and fulfill all obligations required by the plan, colloquially referred to as the feasibility test. See 11 U.S.C. § 1225(a)(3), (6).

The question of whether a Chapter 12 plan is feasible is not typically a simple yes-or-no question but rather an analysis of where, on a continuum of feasibility, a particular plan falls. On one end of the continuum are the plans that rely exclusively on a single, clear event, such as a sale contract that will produce a fixed amount of cash that is at least equal to the sum needed to fund the plan. The Court need only compare the proposed plan to the sale contract and proposed closing statement to determine – or verify – that the plan is feasible. At the other end of the continuum are the cases in which the plan is so woefully vague, or the record is so insufficient or internally inconsistent, that the Court can easily determine the Plan is not feasible. Most cases, however, fall somewhere in between those two ends of the feasibility continuum, and compel the Court to reach a determination based on careful analysis and weighing of the totality of facts and circumstances of the case. The salient facts and circumstances include, but are not limited to, the value and equity of the debtor's assets, the nature and amount of the

---

[3] All statutory citations refer to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.

3

debtor's liabilities, the efficiency of the debtor's operations, the debtor's pre-petition transactions with creditors, the debtor's historical performance, the terms of the proposed plan, and other evidence showing the likelihood of success in chapter 12. How much weight the Court assigns to each of these factors will vary from case to case and depend, in part, on whether there are objections to confirmation and the basis for each objection. In this middle region of the continuum, the Court is not engaged in a mathematical computation of fixed components. Rather, it is making a judgment based on an assessment of myriad moving and mutable parts.

On the date of the confirmation hearing in this case, it was clear the Debtors' case fell somewhere in the wide middle portion of the feasibility continuum. The testimony and other evidence before the Court at the confirmation hearing made it clear the Debtors were relying, in part, on a new type of farming to fund their reorganization, and therefore the assessment of feasibility included more speculation – and confidence in the Debtors' farming expertise and commitment to reorganizational success – than there would be in a chapter 12 case in which the debtor was continuing their current scope of operations. Although Wells Fargo presented an accountant to testify at the confirmation hearing, to challenge the underpinnings of the Debtors' feasibility arguments, that professional lacked the expertise to assess the financial viability of the Debtors' projected operations, and the Debtors and their witnesses were able to persuade the Court their projections were well-founded and supported a finding of feasibility.

While the Court found the plan fell slightly to the feasible side of the midpoint on the feasibility continuum, and the Debtors had demonstrated they deserved an opportunity to try to fulfill the obligations they set out in their fourth amended plan (doc. # 124, the "Plan"),[4] the Plan was not far enough over that midpoint to give the Court confidence that Wells Fargo would not soon find its loan in default status (again) and need to file a motion for relief from stay to enforce its rights against the Debtors' property – and thus resume the cycle of litigation with the Debtors. The Debtors' inability to succeed in their prior chapter 12 case and previous workouts attempts with Wells Fargo, combined with the fact that the Plan then before the Court was the fourth amended plan in this case, gave the Court pause, and made all too real the possibility of more and expensive litigation if the Debtors were unable to achieve the production and sales goals upon which their Plan depended.

To fulfill its equitable responsibility, the Court both granted the Debtors confirmation and the opportunity to prove they were able to consummate the Plan and make all payments required thereunder, on the one hand, and provided Wells Fargo protection, and swift relief, in the event the Debtors failed to do so, on the other. In exchange for giving the Debtors the benefit of the doubt and another chance to attempt reorganization, the Court took the extraordinary step of entering an order, on its own initiative,

---

[4] The Debtors' three previously proposed plans were filed at doc. ## 32, 68, and 74.

4

that provided a remedy for Wells Fargo in the event the Debtors were unable to fulfill the obligations they undertook in their Plan – to avoid litigation for both parties and to avoid more delay for Wells Fargo. While this Conditional Dismissal Order imposed unusual and tight restrictions on the Debtors, the Court found this to be a fair and reasonable trade-off for confirmation of a plan that just barely met the feasibility test. To elucidate that balancing of interests, the Court began its Order with a preamble of its rationale and description of the relief:

> To protect Wells Fargo from the consequences of another default by Debtors and the corresponding possibility of more expensive and time consuming litigation; and
>
> In light of the unique history and circumstances of this case, as described in earlier rulings and the June 22, 2018 bench ruling, the Court hereby exercises its equitable powers (i) to enter a conditional order of dismissal in favor of Wells Fargo, in the event the Debtors substantially default on their obligations to Wells Fargo under the confirmed Plan; and (ii) to impose a one-year filing bar in the event this case is dismissed prior to completion of the Plan, for any reason.

Doc. # 147, p. 1.

Against that procedural backdrop, the Court turns first to the Trustee Motion.

1. THE TRUSTEE'S MOTION TO AMEND OR VACATE THE CONDITIONAL DISMISSAL ORDER

The gravamen of the Trustee Motion is it is no longer fair for the Debtors to be constrained by the Conditional Dismissal Order. The Trustee asserts that while such restrictions may have been warranted during the first year of the Debtors' operations under the confirmed Plan (doc. # 233, p. 1), those restrictions are no longer necessary and, contrary to their intended purpose, are now increasing the stress on the Debtors and impairing the Debtors' ability to successfully reorganize. He begins by observing how this case has progressed through the date of his Motion:

> As this case moves into 2020, the trustee can report that not only have the debtors met both the sale requirements of the Plan and the stepped up monthly payments through the end of 2019, but **the debtors have also paid more to their creditors over the first 18 months of their operating Plan than any debtors in the history of Chapter 12 in the District of Vermont**. By December 2019, the debtors had paid the trustee, from sale proceeds and monthly payments a total of $1,175,120.67 and the trustee has distributed $1,174,774.65 to their creditors. The total payments to the trustee called for in the Plan is $1,863,325.18. **The above totals show at this point the debtors have completed over 63% of the total payments to the trustee. The amounts paid to Wells Fargo alone equal $388,569.51 or over 54% of the $715,374.45 to be paid to Wells Fargo through the 5-year Plan**
>
> …

5

> From the trustee's perspective there can be no serious doubt as to the debtors' commitment and determination to repay their creditors and complete this Plan. Plan performance to date has included not only the sale of real estate for over $720,000, but also the sale of milking parlor equipment for almost $100,000, during one of the worst economic environments for dairy farming in the past several decades.

Doc. # 233, p. 2 (emphasis added). The Trustee then goes on to argue his position:

> Aside from the sales of land and equipment, the other feasibility question was whether the debtor's projections for hay, beef and other sales would be sufficient to fund the monthly payments. **Now, eighteen months into the Plan, with two payment adjustments behind them, the debtors concluded the 2019 year, current in payments to the trustee**. This fact, more than any evidence presented at the confirmation hearing show the debtors' plan to be feasible. The trustee believes that the above record provides a reasonable basis to take a fresh look at the Court's July 13, 2018 Order granting conditional dismissal.

Doc. # 233, p. 3 (emphases added).

In its opposition to the Trustee Motion (doc. # 241), Wells Fargo focuses on the source of the Debtors' payments, emphasizing that "[m]eaningful payments primarily have come *not* through [the Debtors'] diligence and hard work but through the *sale of assets* – cows, equipment, land" (doc. # 241, p. 2; emphases in original). Wells Fargo insists the Trustee has failed to identify any "extraordinary circumstances required to justify" relief grounded in the Court's equitable powers under § 105 (doc. # 241, p. 3). Wells Fargo also asserts the Court should deny the Trustee Motion because the Trustee has failed to demonstrate Wells Fargo will not suffer undue hardship, which it defines as "never ending litigation as its rights are repeatedly tread upon" (doc. # 241, p. 6).[5]

    a. *This Court's Equitable Authority to Amend or Vacate the Conditional Dismissal Order*

At the time of confirmation in 2018, the Court examined all circumstances before it, including the record in the case, the testimony and filings associated with the confirmation hearing, the Debtors' previous attempt to reorganize under the Bankruptcy Code, and the litigious history between the Debtors and Wells Fargo. In the exercise of its equitable powers, the Court made the determination to impose extra conditions on the Debtors, and grant Wells Fargo extra relief, to reach what it perceived to be a fair balancing of rights and obligations. To achieve this balance, the Court sua sponte entered the Conditional Dismissal Order, at the same time it confirmed the Debtors' Plan over Wells Fargo's vigorous objection, to protect Wells Fargo from protracted and expensive litigation if the Debtors failed to meet their commitments, because at that time the Debtors' track record suggested a higher than usual degree of risk for creditors in this case and the Court perceived the Plan to be just barely feasible.

---

[5] Wells Fargo also questions why the Trustee did not file his motion for relief from the conditional dismissal order sooner and argues the Debtors were in substantial default before the Trustee filed his Motion (doc. # 241, p. 5). The Court finds that argument to be without merit. The Trustee Motion was filed on February 26, 2020, and Wells Fargo did not file its notice of substantial default until March 3, 2020 (see doc. ## 233, 236).

A bankruptcy court has the power to reconsider its previous orders when equity so requires, so long as no intervening rights have become vested in reliance on the orders. In re Signature Apparel Grp., 577 B.R. 54, 97 (Bankr. S.D.N.Y. 2017); see also BII, Inc. v. Chapter 7 Trustee for IBI Sec. Serv. (In re IBI Sec. Serv.), 133 F.3d 205, 209 (2d Cir. 1998) ("A bankruptcy court has the power to reverse its prior orders pursuant either to its general equitable powers or Bankruptcy Rule 9024."); Miller v. Generale Bank Nederland, N.V. (In re Interpictures Inc.), 2000 U.S. App. LEXIS 1848, *5 (2d Cir. Feb. 3, 2000) ("The bankruptcy court sits in equity and is impowered to invoke equitable principles to achieve fairness and justice.") (citing In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994)); Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.), 352 F.3d 671, 680 (2d Cir. 2003) (concurring opinion); cf. Kornfield v. Schwartz (In re Kornfield), 164 F.3d 778, 784 (2d Cir. 1999) ("A totality of circumstances inquiry is equitable in nature").

No intervening rights have become vested in reliance on the Court's Conditional Dismissal Order, as the Court previously determined dismissal was not warranted based on Wells Fargo's January 2019 notice of substantial default, and Wells Fargo did not file its 2020 notice of substantial default until after the Trustee filed his Motion requesting the Court vacate or modify its Conditional Dismissal Order. Just as it did at confirmation, the Court shall again examine the circumstances before it – as they have evolved – to again take the steps necessary to strike a fair balancing of rights and obligations. The Court is aware of those pre-confirmation circumstances in this case, but now also has before it a record documenting over a year of the Debtors' actual performance under the confirmed Plan. The question the Court must answer is whether the risks the Court identified at confirmation have been reduced sufficiently to tip the scales in favor of releasing the Debtors from the extra constraints imposed by the Conditional Dismissal Order.

The Debtors' Plan, as most recently modified in 2019, treats Wells Fargo's claim as follows:

> CLASS 4 – Wells Fargo Financial Leasing Company (Wells Fargo). This lien is secured by a second priority mortgage on the real estate owned by the Debtors and a first priority interest in the milking equipment. The allowed amount of this claim is $1,733,635.60. Wells Fargo Financial Leasing Company has received the sum of $184,614.63 from the sale of real estate and has received $27,160.00 from the sale of two milk tanks. Wells Fargo will receive $77,600.00 from the sale of the milking parlor equipment which will be sold by April 19, 2019. The balance of the claim, $1,444,260.87 shall be paid the sum of $7,155.83 [monthly] through the Chapter 12 Plan. This payment is based on a 300 month amortization at an interest rate of 4%. Upon completion of the Chapter 12 Plan Debtors will make monthly payments to Wells Fargo Bank in the amount of $13,124.63 per month for 119 months.

(doc. # 215, p. 3; see also doc. # 228 (order granting motion to modify plan to extend time to sell milking parlor equipment)).

The Trustee reports that by December 2019, 18 months into their five-year Plan, the Debtors had made over 63% of their total plan payments, and over 54% of their total payments to Wells Fargo (doc. #

7

333, p. 2). Although Wells Fargo asserts the Debtors failed to pay their January through March 2020 plan payments (doc. # 241, p. 1), the Trustee counters that he timely received the Debtors' March 2020 payment (doc. # 244, p. 1), and further argues the January and February default was due to inherent risks of farming and farm economics, not lack of feasibility, and the Debtors' proposed modified Plan – filed to cure that default – is feasible (doc. # 233, p. 4; doc. # 248, p.1).

In this Court's exercise of its general equitable powers, and specific authority under § 105, the Court has reassessed the appropriateness and necessity of the Conditional Dismissal Order, in the context of the Debtors' current circumstances, performance under the confirmed Plan, and the unique factors applicable to assessing farming operations and chapter 12 plans. The key developments in this case are (i) the Debtors have reduced the debt they owe to Wells Fargo by more than 50% in just the first 18 months of their 60-month Plan, (ii) the Debtors were not in a position of substantial default prior to the Trustee Motion, and (iii) notwithstanding the loss of what the Trustee estimates as at least $20,000 from the sale of pumpkins alone, plus additional lost hay and off-farm income, the Debtors fell short in payments by only $23,000.

These factors persuade the Court that the Debtors are working diligently – and generally successfully – in meeting their Plan obligations and, consequently, Wells Fargo has not suffered any diminution in its position during the first 18 months of the Plan. In fact, Wells Fargo admits the Debtors' payments to date under the Plan have "improved [Wells Fargo's] position on the remaining real estate" (doc. # 250, p.3) – another benchmark in assessing whether the conditional relief is still necessary. In light of these factors, the Court finds Wells Fargo is no longer in a position of extraordinary risk, and the feasibility meter points farther over to the more feasible portion of the continuum. Therefore, principles of equity require the burdens imposed by the Conditional Dismissal Order be lifted.

  b. *The Procedural Change in the Court's Treatment of Conditional Relief Orders, Generally*

Additionally, and unrelated to this case, in early February 2020, the Court and Clerk's Office discovered certain technological processing difficulties caused by conditional orders that lacked termination or expiration dates. At that time, the Court concluded, for procedural and legal reasons, that orders granting conditional relief should have expiration dates and should only be in effect as long as necessary to demonstrate the debtor has satisfied the condition (typically to make payments) and a reliable pattern of performance. The Court notified the Vermont bankruptcy bar at the February 28, 2020 Bench Bar meeting that, from that day forward, it would scrutinize proposed orders for conditional relief, and insert termination dates where appropriate and necessary, to ensure that each conditional order is in effect only long enough (a) to demonstrate the creditor who obtained the conditional relief is no longer at great risk of the consequences of the debtor's default, (b) to mitigate such other risks the creditor identified, or (c) for the

8

equity ratio to shift in the creditor's favor.[6]

In response to the Trustee Motion, the Court applies that analysis here, inquiring whether the Debtors' conduct and payments under the confirmed Plan to date have diminished Wells Fargo's risk of loss and extensive litigation – the two eventualities the Court sought to address. If so, there is no need for the Conditional Dismissal Order to remain in effect. Based on the Trustee Motion and Reply, as well as the Debtors' and VACC's filings, the Court finds Wells Fargo's risk has been palpably diminished because the Debtors (1) have paid Wells Fargo $388,569.51 out of the $715,374.45 due under the Plan (see doc. # 233, p. 2), as of the date of the Trustee Motion, (2) are continuing to make payments, and (3) have filed a motion seeking to modify their Plan to maximize the likelihood of success in this case.

### c. *The Impact of the COVID-19 Pandemic*

Finally, the Court would be remiss if it failed to acknowledge and take into account the impact of the novel coronavirus and the declaration of the federal government with respect to creditor enforcement of rights, as set out in the CARES Act, and the State of Vermont's response to the pandemic pertaining to foreclosures. See H.R. 748, § 4022 (enacted Mar. 27, 2020) ("Foreclosure moratorium and consumer right to request forbearance"); see also Vt. S. 333, Act. No. 101 (enacted May 14, 2020) ("An act relating to establishing a moratorium on ejectment and foreclosure actions during the COVID-19 emergency"). This is not the time to punish farmers who are trying to repay creditors through a restructuring of their operations and sale of unnecessary farm assets. Moreover, it is not likely Wells Fargo would be able to enforce its rights against its collateral, even if relief were available under the Conditional Dismissal Order, due to the extant moratorium on foreclosures in Vermont.

### d. *Modification and Termination of the Conditional Dismissal Order*

For all of these reasons, and in the exercise of this Court's equitable powers, THE COURT FINDS modification and termination of the Conditional Dismissal Order are warranted.

The Court is intentionally not vacating the Conditional Dismissal Order because that Order served an essential purpose and was sound when entered. Rather, the Court is, first, *modifying* the Conditional Dismissal Order to include a termination provision that authorizes termination upon a showing it has

---

[6] For this reason, the Court included the following item on the agenda for the Bench Bar meeting set for February 28, 2020:
> To enable the Clerk's Office and Court to more effectively track **conditional orders**,
> 1. include an expiration date in the motion and proposed order that will "terminate" the open status of the matter w/o further action (see Bessette stip 19-10302); or
> 2. set a status hrg in the order, with a date that is after last deadline in the order (e.g., if D req'd to make pmts for 3 mos, then set a sts conf in month 4); and
> 3. refrain from including case-long requirements in cond'l relief stips or orders (6 mos shd be the max unless there are extraordinary circs); and
> 4. note that, at any time, the movant can file stmt saying conditions satisfied, to trigger the Clerk's Office "termination" of the motion/ stipulation

(emphasis in original). The Clerk's Office circulated the agenda to the Vermont bankruptcy bar on the morning of February 26, 2020, prior to the filing of the Trustee Motion.

9

accomplished the purposes for which it was created, i.e., to protect Wells Fargo until the Debtors meet payment projections for a period of time sufficient to show the higher risk to which Wells Fargo was subject at confirmation has been reduced to the level of risk inherent in any chapter 12 case. At this point, based on the number and amount of the payments the Debtors have made to the Trustee, and the Trustee has disbursed to Wells Fargo, the Court is persuaded the risk level in this case is now no greater than in any chapter 12 case, and the Debtors should not be constrained by – and Wells Fargo is no longer entitled to – the expedited path to dismissal set out in the Conditional Dismissal Order. Second, the Court is *terminating* the Conditional Dismissal Order as of February 26, 2020, the date on which the Trustee filed his Motion demonstrating that Order had accomplished the purposes for which it was created.

2. THE DEBTORS' MOTION TO MODIFY THEIR CONFIRMED PLAN

In their Motion, the Debtors seek to modify the terms of their current Plan. Specifically, the Debtors seek to reduce the amount of their monthly payments by $57,700 over 14 months, as follows:

(i) The Plan, as previously modified, includes, inter alia, monthly payments of $11,500.00 from June 2019 through May 2021 (doc. # 215, p. 1).

(ii) The proposed modified Plan (doc. # 238, the "Modified Plan") provides for monthly payments of $11,500.00 from June 2019 through December 2019 (no change); no payment for January or February 2020 (the default at issue); $7,400.00 from March through September 2020 (reduced amount); $10,300.00 from October 2020 through February 2021 (reduced amount); and $11,500.00 from March through May 2021 (no change) (doc. # 237-1, p. 1).[7]

The $7,400.00 payments in March through September 2020 will be devoted exclusively to the Wells Fargo claim. In October 2020, when the payments increase to $10,300.00, in addition to paying the Wells Fargo claim the Trustee will begin sending interest only payment to the junior creditors, VACC and USDA Farm Service Agency ("FSA") (doc. # 238, pp. 9–10; doc. # 249, p. 2).

The Debtors identify clearly the circumstances underlying their need for modification:

> [Due] to the rainy conditions of May and June, 2019, [the] Debtors were not able to plan the pumpkins they had anticipated planting in 2019 and because they were not able to complete their first cutting of hay until the end of July, 2019, they were not able to get in a third cut of hay. Tay Simpson also lost her full-time job off the farm

---

[7] The Court notes three minor deficiencies in the Modified Plan and proposed order. First, the Modified Plan provides for payments of "$15,855.05.00" per month from June 2022 through May 2023 (doc. # 238-1, p. 1). This appears to be a typo, as there is no indication the Debtors intend this amount to change from the current amount of $15,855.00 (see doc. # 215, p. 1). Second, while the reduction in plan payments totals $57,700, the Debtors specify the total amount to be paid through the Plan is $1,723,541.30 (doc. # 238-1, p. 2). This appears to be a math error, as the total amount paid through the Plan is currently $1,863,325.18 per the confirmation order (doc. # 145, p. 5), payment amounts did not change in prior Plan modifications, and the differential between those two totals is much greater than $57,700. Third, although the $57,700 in reduced plan payments appears to be balanced by an equivalent reduction in disbursements through the Plan ($40,000 paid to the Town of Braintree outside the plan and $17,863.92 in reduced payments to VACC and the FSA), the Debtors do not expressly state how the reduced Plan payments are balanced by reduced disbursements or whether the reduced disbursements to VACC and FSA will result in higher post-Plan payments to those creditors. The Court will direct the Debtors to submit a revised proposed order that addresses these three deficiencies.

10

> in the fall of 2019. She has now obtained other employment, but it does not pay as well as her prior job.

Doc. # 237, pp. 1–2. The Debtors describe their intentions going forward, and how the Modified Plan's approach will benefit creditors, as follows:

> Debtors were able to harvest certain timber on their property and are now changing their method of selling their beef, lambs and goats which they slaughter to having them slaughtered and packaged by a USDA certified facility and will be selling their meats cut and wrapped, rather than by the animal. This will increase [the Debtors'] income from the sale of meat. They intend to plant pumpkins, rhubarb and horseradish in 2020 as they have a market for the sale these products.
>
> The Modified Plan reduces the monthly payments to $7,400.00 from March 2020 through September 2020, then increases the payment to $10,300.00 from October 2020 through February 2021, then increases the payment to $11,500.00 for March 2021 through May 2021. The payments for the remainder of the Plan remain the same.
>
> The Modified Plan does not affect any other claims.

Doc. # 237, p 2. The Debtors affirm they have paid $1,186,919.48 into the Plan as of the date of the Debtors Motion, March 5, 2020 (doc. # 237, p. 1).

In its opposition to the Debtors Motion (doc. # 243), Wells Fargo argues the Court should deny the Debtors' request to modify their Plan on three related grounds: (a) bad weather is an inherent risk of farming and not an unforeseen circumstance as required for modification; (b) the Debtors Motion lacks sufficient detail to support modification; and (c) the Modified Plan is not feasible.

### a. *Unforeseen Circumstances Not Required for Plan Modification*

Wells Fargo contends the Debtors may only modify their Plan if the circumstances giving rise to the need for modification were unforeseeable. Wells Fargo asserts the Debtors faced and were unable to overcome inherent risks of farming, failed to explain why they could not manage those risks or take earlier action when adverse weather impacted their operations last spring, and will likely continue to face bad weather in the years to come. While not explicit, Wells Fargo implies the Debtors should not be permitted to modify their Plan based on the *foreseeable* risk of adverse weather which plagues all farmers.

Although there is ample case law on both sides of this issue to mount a well-supported argument, the Court does not share the view that a debtor may only modify the plan based on unforeseen or unanticipated circumstances. The Court previously addressed the issue in the context of an equally contentious case under Chapter 13, in which it concluded

> [B]ased upon the lack of both statutory foundation and controlling jurisprudence requiring debtors to establish cause or show any change in financial circumstances as a condition to modification, the voluntary nature of Chapter 13, and the language of § 1329, the Debtor is not required to demonstrate he experienced a substantial and unanticipated change in his financial circumstances as a prerequisite to obtaining modification of his plan.

In re Ladieu, 548 B.R. 49, 66 (Bankr. D. Vt. 2016).

11

The Court's rationale in that case is equally applicable here, given the equally voluntary nature of Chapter 12 and similar language of § 1229. Thus, the Debtors are not required to show their underlying reason for seeking modification is a change they could not have anticipated.

   b. *Sufficient Detail Provided in Support of Modification without Need for Evidentiary Hearing*

Wells Fargo argues the Debtors Motion lacks any supporting affidavits, projections, or other data, which leads it to conclude "the modified repayment plan appears wholly random." (doc. # 243, pp. 1–2). Wells Fargo declares, "[t]his lack of detail is particularly surprising given the [Debtors'] apparent failure to pay their property taxes, default to Bar Harbor Bank, historical inability to pay their creditors and repeated defaults on every payment plan with Wells Fargo, including on payments due under the Plan." (id., p. 1).

In response, the Debtors submitted an affidavit of Robert Simpson showing the Debtors' actual income and expenses incurred in 2020 and projections for 2020 and 2021 (doc. # 249-1). The Debtors argue "[t]he projections attached to the Affidavit show that the Debtors will have more than sufficient income to make their Plan payments through 2020 and 2021 and with the development and growth of the mealworm business will be able to make the payments through the balance of the Plan." (doc. # 249, p. 3). Wells Fargo dismisses the affidavit and projections as devoid of supporting data, cursory, ever optimistic, and self-serving (doc. # 250, p. 2).

While the Court addresses the feasibility of the Plan and projections below (see § 2(c), infra), it finds the Debtors have met their obligation to present the Court with projections that are facially sound.

Under other circumstances, in response to Wells Fargo's opposition to the Debtors Motion, the Court might set an evidentiary hearing to allow Wells Fargo to examine the Debtors under oath, present witnesses who might be able to demonstrate flaws or gaps in some of the Debtors' assumptions or computations, delve deeper into the soundness of the Debtors' operations, or identify errors in the Debtors' assumptions, analysis, or conclusions. However, in light of the changes to this Court's procedures[8] and restrictions on foreclosure rights in response to the COVID-19 pandemic (see § 1(c), supra), the Court finds it must be more circumspect in setting evidentiary hearings, and must balance the possible benefits of an evidentiary hearing against the grave potential risks to the parties and witnesses if required to prepare for and appear at an in-person evidentiary hearing.

Although the record would be more complete if the Debtors had filed supporting data or backup documentation demonstrating the basis for each line item in the projections the Debtors filed, those projections align with past performance and are sufficiently detailed for the Court to make a determination of feasibility without an evidentiary hearing. Thus, the Court concludes a determination of

---

[8] See Standing Order # 20-09, issued March 16, 2020 (rescheduling all evidentiary hearing and trials unless time-sensitive issues must be addressed immediately); see also General Order # 86, issued March 23, 2020 (deciding matters on the papers whenever possible).

feasibility without an evidentiary hearing is warranted, based principally on the modest changes to the Plan proposed in the Debtors Motion, the Debtors' explanation and projections for the Modified Plan, and the impact of the COVID-19 pandemic.

### c. *Modified Plan Satisfies Feasibility Requirement*

With respect to feasibility, Wells Fargo argues the Debtors' Modified Plan and projections are overly optimistic. It asserts if the Debtors' mealworm business were producing the income the Debtors had projected, and their diversification of operations had worked as the Debtors projected at the confirmation hearing, then that diversification should have insulated them against the losses caused by poor weather conditions and Tay Simpson's reduced income from off-farm employment. Wells Fargo points to the Debtors' lack of effort as the real reason the Debtors need to modify their Plan:

> Nothing in [the Debtors'] motion suggests that they made any adaptations, implemented foresight, or acted with diligence, all attributes necessary to sustain a long term successful enterprise. Instead, [the] Debtors waited until the last possible second to file what amounts to a Hail Mary.

Doc. # 243, p.3. Wells Fargo also emphasizes that the Court confirmed the Debtors' Plan largely because the Debtors touted the value of, and financial protection ensured by, a diversification of their operations, and now the Debtors blame the inherent risks of farming to explain why the current Plan needs to be modified. Wells Fargo pointedly concludes, "[i]f the Simpsons cannot adjust to bad weather and continue to make plan payments, the [Modified] Plan is not feasible." (id. at p. 5).

VACC filed a memorandum of law in support of the Debtors Motion, in which it "contends that the modest changes to the plan ... are reasonable and the plan amended appears to be feasible." (doc. # 247, p. 2).

The Trustee also filed a memorandum of law in support of the Debtors Motion, in which he articulated the factual and legal bases for his position that, notwithstanding the Debtors' recent default in payments, their farming operation remains viable and the Modified Plan is feasible. The Trustee's analysis is that the $23,000 payment default (2 payments of $11,500) is almost entirely attributable to the lack of a pumpkin crop, which the Debtors had anticipated would net $20,000. The Trustee gives great weight to this correlation, arguing that since the Debtors were able to make their plan payments during 2019, despite the loss of pumpkin, hay, and off-farm income, the Debtors' overall "economic picture" is still solid. The Trustee also points to the Debtors' inventory of mealworm frass, with an estimated market value of $60,000, as a source of income not included in the Debtors' original projections, and which the Trustee asserts will, in time, enable the Debtors to complete their Plan. In further support of the Debtors' Motion, the Trustee emphasizes the need to treat farmers' motions to modify chapter 12 plans as "routine." The Trustee also urges the Court to give substantial weight to the support VACC has voiced for the Debtors Motion, highlighting VACC's expertise.

13

> VACC is perhaps the pre-eminent farm lender in the state along with the Farm Service Agency. VACC has considerable experience evaluating farms and farm reorganization plans. Initially when this case was filed, VACC was not in favor of the debtors' reorganization, but events since that time, including the debtors' performance this far, have obviously impacted VACC's assessment of the farm operation.

Doc. # 248, p. 4. VACC's supports for the Debtors Motion is especially noteworthy because VACC bears the brunt of the reduced payments through a hiatus in its payments until October. Finally, the Trustee asks the Court's attention to give substantial weight to the fact that the Modified Plan does not modify the treatment of Wells Fargo's claim. In conclusion, the Trustee argues the modified Plan treats all creditors – including Wells Fargo – better than dismissal would.

The Debtors' memorandum of law in support of their Motion summarizes their performance under the confirmed Plan, through March 2020, as follows:

> This case was confirmed on July 13, 2018. The Confirmed Plan provided for the sale of certain real estate and personal property. Those sales have been consummated with the proceeds from those sales, totaling $1,036,120.67 being paid to the trustee. Because the sales of both the real estate and the personal property were caused by the efforts of the Debtors, no commissions were required to be paid upon the sales, which increased the payments to the secured creditors by approximately $100,000.00. Debtors have also paid the sum of $150,500.00 into the Plan in monthly payments. During the first eighteen months of the Plan, Debtors plan payments remained current.

Doc. # 249, p. 1. The Debtors' projections show the Debtors will have sufficient income, using what the Debtors say are conservative sale and income projections, to make all payments under the Modified Plan.

Wells Fargo filed a sur-reply in response to the memoranda of law filed by VACC, the Trustee, and the Debtors (doc. # 250). There, Wells Fargo argues, with respect to the sequencing of events in this case, it is crucial that even though the Trustee filed his Motion the day *before* Wells Fargo issued its first payment default notice, he filed it *after* the Debtors' payment defaults occurred *and after* Wells Fargo inquired of the Trustee about the status of the Debtors' plan payments. Wells Fargo's position is that "[the Debtors] and the Trustee look to [diminish] Wells Fargo rights and put its recovery of amounts owed at further risk." (doc. # 250, p. 5). Wells Fargo identifies delinquent property taxes, a default in the payments to Bar Harbor, and multiple missed payments under the Plan as proof "the Plan is clearly failing." (id.). Its concluding argument is:

> Wells Fargo went into the Plan owed over $1,700,000. It was paid a little under $300,000 from the sale of assets. If the Plan were successfully completed, Wells Fargo would still be owed over $1,300,000. Under the [Modified] Plan, the Simpsons would be scheduled to pay Wells Fargo $13,124.63 per month for approximately ten years (119 payments totaling over $1,500,000), a monthly sum well in excess of monthly obligations the Simpsons have already failed to maintain over many tries. There simply has been no clear and convincing evidence to justify

14

eliminating Wells Fargo's hard won protections to arrive at such a prejudicial outcome that will only put the parties back before this Court again and again.

(Id.).

Wells Fargo correctly argues the Debtors bear the burden of proof to show modification is warranted and the proposed Modified Plan is feasible. The criteria the Court must apply in determining whether to grant the Debtors' Motion is whether the Debtors have satisfied § 1229, which provides, in pertinent part:

> (a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, on request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—
>   (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;
>   (2) extend or reduce the time for such payments;
>   (3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan; or
>   (4) provide for the payment of a claim described in section 1232(a) that arose after the date on which the petition was filed.
> (b) (1) Sections 1222(a), 1222(b), and 1223(c) of this title and the requirements of section 1225(a) of this title apply to any modification under subsection (a) of this section.
>   (2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.

11 U.S.C. § 1229(a), (b). These criteria provide Chapter 12 debtors with a broad, but not unlimited, right to modify their confirmed plans.

> The preeminent bankruptcy treatise describes the parameters for modification in chapter 12:
>
> At a minimum, the party requesting modification ought to be able to show some change in circumstances from the date of the original confirmation hearing. If the debtor's net income was less than projected, and the debtor is not able to meet the debtor's payment obligations under the plan, the debtor may seek a modification to reduce the amount of the debtor's payments under the plan. Conversely, if the debtor's net income was greater than that projected by the plan, modification may be sought by the trustee or a creditor to increase the amount of payments to be made under the plan so long as such modification complies with section 1229(d). <u>Because of the difficulty in projecting income from a farming operation, requests for modification occur much more frequently than in chapter 13 cases and modification should be viewed as a routine and expected part of a chapter 12 case</u>. In examining a request for modification, the court should be guided primarily by the disposable income requirement of section 1225(b). The proper amount to be paid by the debtor to unsecured creditors under that test is the debtor's net disposable income during the plan period. The court should not hesitate to approve modification of a plan to accomplish this goal.

8 COLLIER ON BANKRUPTCY ¶ 1229.01 (Richard Levin & Henry J. Sommer eds., 16th ed.) (emphasis added).

The Debtors are subject to the whims of the weather, the unpredictable fluctuations in the

15

agricultural market, and now the far-reaching and evolving effects of the COVID-19 pandemic. The Court starts with that premise and then focuses primarily on three inquiries to determine whether the Debtors' Modified Plan is likely to be successful: (i) have the Debtors acted in good faith and diligently performed their obligations under the current Plan; (ii) have the Debtors presented a credible and sound explanation for why the modification is needed; and (iii) will any creditors suffer a diminution of treatment under the proposed modification and, if so, do they object to the treatment.

The first prong of this test does not require perfect performance, but rather that the Debtors acted diligently to meet their payment obligations. The Court finds that Debtors have done that here, based principally on their persistent and ultimately successful efforts to liquidate assets and make payments derived from the operation of their farm, such that they have made approximately two-thirds of the total payments due under the Plan before completing the first third of the Plan term.

The Debtors have likewise presented a credible and sound explanation for why the modification is needed, pointing to three circumstances that coalesced in 2019: the inability to plant pumpkins and do a third round of haying, due to weather conditions, and Tay Simpson's loss of off-farm income. The question of whether these losses might have been anticipated is not determinative, but the fact that the Debtors completed sales of assets to offset a substantial portion of that loss is.

Finally, the Court observes that the only creditors whose treatment is diminished by the Modified Plan are VACC and the FSA. VACC not only consented to the Motion but also filed a memorandum of law in support; the FSA did not object. Both VACC and the Trustee have examined the record in this case and concluded the Modified Plan is feasible. Those parties have significant chapter 12 expertise, are familiar with the Debtors' operations and performance thus far under the Plan, and hold a significant stake in the Debtors' future success.

Wells Fargo, as the only creditor objecting, has not shown how the Modified Plan will diminish its treatment in this case in any way. Wells Fargo contends that, under the Modified Plan

> Although not shown in redline as required, because of the reduced payments under the Plan as modified, post plan payments to Wells Fargo would be increased by more than $1000 per month from $12,011.62 to $13,124.63. Debtors have never been able to manage payments in that amount.

16

(doc. # 243, p. 7). However, the Court finds this argument to be without merit, as the Court approved that increase in an order granting a prior motion to modify entered on March 4, 2019 (doc. # 212).

In sum, THE COURT FINDS the Debtors' performance to date, projections, and lack of diminution of any claim other than that of non-objecting creditors, show the Debtors have satisfied the feasibility test.

3. WELLS FARGO'S NOTICE OF SUBSTANTIAL DEFAULT WITH REQUEST FOR DISMISSAL

The Court has terminated the Conditional Dismissal Order as of February 26, 2020, the date of the Trustee Motion (see § 1, supra). Wells Fargo did not file its notice of default (doc. # 234) or notice of substantial default with request for dismissal (doc. # 236), seeking dismissal of the case pursuant to the terms of the Conditional Dismissal Order, until after the date on which that Order terminated. Further, the Court has granted the Debtors' request to modify their Plan to cure the January and February 2020 default in plan payments (see § 2, supra).

Accordingly, THE COURT FINDS the facts and arguments Wells Fargo has asserted in support of its Notice of Substantial Default are insufficient to constitute a basis for dismissal of this chapter 12 bankruptcy case.

## CONCLUSION

For the reasons set forth above, the Court grants the Trustee's request to modify the Conditional Dismissal Order, grants the Debtors' motion to modify their confirmed Plan, and denies Wells Fargo's request for dismissal based on the Notice of Substantial Default.[9]

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

June 1, 2020  Colleen A. Brown
Burlington, Vermont  United States Bankruptcy Judge

---

[9] The Court has considered all of the parties' arguments and, to the extent not specifically addressed herein, finds them to be without merit.

17